Last case, People of the State of Illinois, against Gordon Hill, 4080823. Counsel, please. Thank you, Your Honor. May it please the Court, Counsel, my name is Amber Gray with the Office of the State Appellate Defender, and I represent Gordon Hill in this matter. This case comes to you today, comes before this Court today because of the denial of Gordon Hill's motion to suppress evidence, seized pursuant to what the defendant argues is an illegal stop and search under Terry v. Ohio, where there are no specific articulable facts to create a reasonable suspicion that Mr. Hill had committed a crime. Instead, the facts amount to no more than a mere hunch that drugs are being sold, not that Mr. Hill is a party to any criminal activity. As the case law teaches us in this area, these cases stand or fall on the facts the officers know at the time they initiate a stop of the defendant. In this particular case, when the officers stop Mr. Hill, they are aware of the following facts. They know that an anonymous tip has come in, or a 911 tip has been received at 630 stating that there is potential drug activity occurring in the furthest north apartment at 111 Fairway Street. They are also aware that two individuals that they allege are lookouts for drug activity or for potential buyers are outside of this apartment on the furthest north end. They've seen them walk up and down the stairs and walk in and out of the apartment how many times, we're not sure. They are also aware of the driver of a red SUV has arrived at 111 Fairway. He exits his vehicle, he enters the building, goes into the apartment at the furthest north end. He's there for what we know is a short period of time. He then exits the building and the apartment unit. The officers, Officer Kidwell and Officer Campbell, have radioed other officers to pull over the driver of the red SUV. And we then have Mr. Hill exit the same apartment that the driver of the red SUV entered approximately five minutes after the driver of the red SUV exits the area. What we don't know at the time, or it's not clear from the record, is that the driver of the red SUV, after he has stopped, cocaine is located on him or in his vehicle. The record is unclear on this point. But I think a fair interpretation of the record is that the officers are not aware of anything found on the driver of the red SUV at the time that Mr. Hill has exited the apartment. Why can't this be a consensual encounter? Why isn't this a consensual encounter? Well, first of all, Your Honor, the state did not argue that at the trial level, nor is the state arguing that today. But this is a consensual encounter. The officers also each both call it a stop. They each testify, we decided to stop the gentleman after he comes out of the apartment. But they have the right to do that, as long as they don't tell him he can't leave. Your Honor, they would have the right. But in this case, they're determining that he needs to be stopped because of the suspicious activity. They're calling it a Terry stop. And like I said before... Or it certainly becomes one after the pat down. It becomes a seizure. Correct, Your Honor. But like I said, the state didn't argue that at the trial level. And it's not being argued today that this is a consensual stop. Going to the case law... You described the call as an anonymous tip. Does it make any difference if it was actually a 911 call? In this particular case, I have read the case law. This court has considered that a 911 call is not altogether anonymous. That they are identifiable. However, in this particular case, that's not the basis of the stop for this case. So it's irrelevant for these purposes, whether or not it's an anonymous tip or not. Because that's not the reason for the stop. They've been surveilling the apartment for about 45 minutes. It was one of the factors that a 911 call had been made, indicating drug activity was taking place in the area where they were doing surveillance. So it's one of the factors. Even you described it as an anonymous tip. I do describe it as an anonymous tip. But as a factor. As a factor. In this particular case, the reason the 911 tip I think is important is because that's the reason they arrived at the apartment. But for purposes of whether or not it's an identifiable person, I don't think that's relevant here. Because they also are surveilling the area for about 45 minutes. But when they see, after receiving this anonymous tip, people exiting or going in quickly, exiting the north end of the apartment, doesn't that tend to corroborate the 911 phone call? Well, Your Honor, if you're referring to the three, there's three drivers that the state references. Those three drivers, the officer, well, and Officer Campbell both testify that they have to move locations because they can't see where exactly these people are going into. So for our purposes, we don't know that they're in the same apartment. There's no testimony to that. They have to move because they're on the west side of the building. So they have to move to the front of the building so that they can see. So then we're left with they only see the driver of the red SUV and the two alleged lookouts pertaining to this specific apartment building or unit, I should say. Was there a recent U.S. Supreme Court case on a 911 call? I mean, not recent, the last one. I haven't read any, Your Honor. As far as the 911 calls being, whether or not they are in fact anonymous, is that what you're referring to, Your Honor? The reliability of them is my recollection. All I read was something in the Chicago Daily Law Bulletin. I know I had the case pulled, but I didn't have it with me when I was reviewing for this last night. Well, as far as from the case law, I've read on the issue and about the reliability. It's a factor to consider in the totality of the circumstances, you know, how reliable the tip is. But really the biggest difference, I think, between some of those cases with the tip is that in general those cases involve police actions where they pull over the person because of the actual tip. So then it gets into the factors, you know, is there any indica of reliability? You know, how much detail did the tip get? But here, none of that's really gone into because that's not really the reason. They get there, that's not the reason they stop Mr. Hill. Going back to some of the case law I've kind of covered, the defendant uses the case of Harper, similar circumstances, and I would say in that case there are worse factors than what we have here because they know it's a known drug location that the defendant in that case was coming out of. The officer on scene had also, he himself had arrested seven individuals coming out of that, it's another apartment building, who had possessed narcotics. In this case we don't know that it's a known drug location. All they have is Mr. Hill coming out of the apartment and walking down the street before they make the stop. Yeah, but Harper didn't have the 911 call. Correct, Your Honor, it did not have a 911 call. Nor the lookouts. Nor the lookouts? Yes. They do have suspicious behavior though, which is what the lookouts are used in this case to kind of buffer that they're seeing some kind of suspicious activity, and in Harper they do have other people that are suspicious that the officer himself has arrested previous to the encounter of the defendant in that case. Whereas here we don't have that. I also might point out that Mr. Hill is never seen interacting with the two lookouts. He's also never seen interacting with the driver of the red SUV. Neither officer testifies to those facts. Your opponent cites Austin. Correct, Your Honor. And you mentioned it in your reply, right? Correct. It doesn't help? I think Austin's distinguishable. Austin relates more specifically in this case to the frisk that happens after the stop, and I think that's distinguishable for several reasons. One of the biggest is that in that case the officer has a specific weapons offense that he's aware of. He knows that the defendant has been charged with unlawful discharge of a firearm. He's also outnumbered in that particular circumstance, and he testifies that the defendant is a large individual and that he's outweighed, and he's also, like I said, outnumbered. In this case, Mr. Hill, all we have is an unspecific, he says, I think he had some drug offenses and weapons offenses. He doesn't know what they are. And as a matter of fact, Mr. Hill, as obviously it comes up later, doesn't have any weapons offenses in his past, but it's what the officer thinks at the time. But we don't have any specifics. They outnumber Hill. They describe Hill as cooperative. He never attempts to flee the officers at any time. And there's no indication that he's larger than either of the two officers either. So I think Austin is distinguishable from this particular situation. The case I was referring to did deal with the issue of reliability of the 9-1-1 call and had to do with, I think the caller was like the third in a series of 9-1-1 calls, and he was observing the events unfold at the time and was describing it to the operator. So you're correct. I don't think it would apply. Thank you, Your Honor. Because of the facts which we've discussed today, including the case law, this includes Austin, which the State uses, it includes Harper, which I use, I simply don't believe there's any reasonable suspicion to stop Mr. Hill under Terry. The evidence, and because of that, the evidence recovered following the frisk must be suppressed, and the trial court's decision denying that motion to suppress must be reversed. And if there are no further questions, I will take those. Thank you, counsel. Counsel, please. Thank you, Mr. Court, counsel. My name is John T. Fionn here on behalf of the State. As defense counsel informed you, we basically have two issues. The first issue before this court is whether the officer has a reasonable, articulable suspicion to first perform the Terry stop on defendant. And case law is clear that we would need to look at the totality of the circumstances. Why isn't this a consensual encounter? Well, I had thought about the consensual encounter, and I think the reason I didn't make that argument is because without the actual seizure, I mean, if we lose the second issue, then the first issue really doesn't mean much to this case. So at some point, and it seemed to me pretty early on, the officers asked if they could search defendant, and defendant said, I believe he said, is that necessary? So I do believe that this became a Terry stop. So if they said no, was he free to leave? I believe he was free to leave, yeah. So it would have been a consensual encounter that turned into a Terry stop. I think so, yeah. But I guess what I'm saying is without the actual seizure part, then we don't have much of an argument here. So I feel like our second issue, whether the seizure was proper, is really the more important issue in this case. So first, we need to look at that. And defense counsel went through these facts. I think there's a few more facts that were relevant in the trial level. And I do agree that each of these facts taken individually might not be a whole lot, but we have so many individual facts that once they pile up, I think they become pretty relevant. First, over the days and weeks prior to this encounter, the police department actually received, and these are pretty vague in the record, I understand that, but they actually did receive other complaints that drug activity was taking place at 111 Fairway Street in Danville, which is where this incident happened. And that's basically all we know, is that several complaints were taken by the police department in this apartment complex. And then on the specific night in question, there was a 911 call to the police department, and the informant said that there was drug activity going on in this apartment complex and specifically referred to an apartment toward the north end. And I think defense counsel would have a stronger case here if the officer showed up, based on this 911 call, showed up, just went to the apartment complex, and started arresting people. But that's not what they did. After they got this 911 call, they actually went and conducted surveillance. They conducted surveillance for an hour and 20 minutes, and the first thing they saw is they witnessed three vehicles pull up to the apartment complex. They saw an individual exit these vehicles, walk up the steps of the complex, and then exit the complex back to their vehicle. And defense counsel mentioned this, and the record supports that at that time, the officers could not actually see the specific unit that these three individuals went into. But they do know that they went into an upstairs apartment unit and exited. And so after that happened, and also I think it's worth noting at this time, that the officers are allowed to use their expertise, their inferences, reasonable inferences, and they saw these people go upstairs and exit quickly. So I think they already have this reasonable inference that drug activity is likely occurring at this apartment unit. So they move where they can see all the apartment units at one time. Weren't there a couple guys who were lookouts? Yeah, there were people that were lookouts. And these two men, and this was, which is really important, but after they moved, they could actually see which apartment unit that these lookouts were entering and exiting. And both officers actually testified that these lookouts entered the northernmost apartment and exited frequently. They were walking up and down the stairs. And again, I think we need to give a lot of credibility to the officers and their expertise. Officer Kidwell testified that he's been in law enforcement for 15 years. Before that, he was in a drug enforcement program. And he's dealt with these things a lot more than I have, and I think we need to give him a lot of credibility when he sees these things out doing surveillance. So he sees these people exit the northernmost. In his opinion, these are lookouts in his expertise, the things that he's encountered. This is the activity that lookouts perform. And then a red SUV pulls up to the apartment complex. Someone exits the red SUV, walks up, and they actually see the individual walk into the northernmost apartment, the exact same apartment unit that they saw the lookouts entering and exiting. The guy from the red SUV exits the apartment unit, walks downstairs, gets back in the SUV, and the SUV pulls off. Soon after that, they see the defendant exit the northernmost apartment unit. They didn't see the defendant enter. There is no testimony that they saw the defendant enter that unit. I don't know how long he was in there. There's no testimony regarding how long they believe the defendant was in there, no. And there's no inference gleaned from these facts that he, like some of the others before him, had entered for only a few moments or minutes and then exited. There was no testimony in that regard, no, Your Honor. Does any of that matter? I don't think it matters. I think that these, like I said, based on these officers' expertise, they're doing surveillance for an hour and 20 minutes, and they are seeing what's happening. They've got the lookouts. They've got people frequently entering and exiting. And I think, if anything, I mean, if you want to infer that he was in there for a long time, then I think you can make a reasonable inference that he was dealing the drugs. If he was in there for a short time, then I think you could probably make an inference that he was buying drugs and exiting quickly. So I think that you can make a reasonable inference, and I think these officers did, based on their hour to 20 minutes of surveillance, that this defendant was dealing with criminal activity. So I think that it matters only in the sense of which criminal activity maybe the officers inferred that the defendant was taking part in. The defense counsel mentions two cases. Harper, and then she also mentioned, I think it's Sybrin in her brief. Harper actually dealt with a case, dealt with a set of facts, where the defendant was never, the defendant was seen around a known drug house. But no drug activity, the officers did not actually testify that they witnessed any drug activity going on that night. The defendant was just hanging around a known drug house. And in this case, not only do we have a known, and I'll call it, I mean, I think you can make a reasonable inference this is a known drug house, based on the fact that the officers both testified that they have received numerous complaints about this specific complex. But the officers have made observations that drug activity was actually occurring on this night. So I think that's a huge distinguishing factor with Harper. With Sybrin, that is a Supreme Court case, it dealt with a defendant who was actually talking to known convicts for, I think, a period of eight hours. But all that was ever observed was just communication. So he was just talking to criminals who had drug pasts and prior convictions, that's all they saw. There was no indicia of drug activity actually going on, on that night. And, like I mentioned, in this case, I don't believe, I mean, I believe you can say the 911 call is not enough. Seeing an SUV pull up to the apartment is not enough. All that stuff individually might not be enough, but we have enough once you pile all this on, that I believe that a competent officer in these officers' positions, who are expected to act quickly, would be justified in stopping the defendant and investigating this situation further. If your honors have no further questions, I can go on to the second issue, whether the officer is reasonably feared for their safety to warrant the search of the defendant. And, again, this is an issue of looking at the totality of the circumstances, whether a prudent man in the circumstances of the officers would be warranted in the belief that their safety was in jeopardy or in danger. And so we look at what was known to the officers, again, at the time that they asked, at the time they performed the search of the defendant. So, officers were not entitled to search someone they suspected having just made a drug deal, correct? That is correct. I believe that the statute says that they must believe that their, they must reasonably believe that their safety is in danger. So it seems that in these cases, and we do have quite a few out of Vermilion County, that the officers all testify there have been murders in this area, and drugs were involved, therefore we get to search everybody we suspect of drugs. Is that what the statute says? No, that's not what the statute says, and I don't believe that's true, and I don't believe the facts in this case, I don't think the facts in this case support that argument. What we have in this case is that we have someone who we knew of these officers reasonably inferred that was dealing drugs prior, immediately prior to the stop. One of the most important things, and this is one of the reasons why I cited Austin, is because the officers, once Officer Kidwell heard defendant, once they asked defendant for his name and he said his name, and Officer Kidwell testified that he recognized defendant's name as someone who had prior drug and firearm, I don't know, he did say convictions, I believe that he said he had a history of weapons and drug offenses. Was that confirmed at trial? Is that in the record? That was not confirmed at trial, but what we're looking at is what the officers reasonably inferred at the time of their search. I think that if you use that sort of... Not the accuracy of what they were inferring? Well, I feel like if you go down that line, then we could also say that their search, the reasonable inference that this guy was dealing drugs was also accurate, and I don't think that we can use the end result to justify the means like that, because I think in every case you could say, oh, maybe the search wasn't warranted, but they did find a gun. So, since they found a gun, then their suspicion was warranted. But it's just, whether it's a reasonable inference is interesting in this case, given the ordinary name of the defendant, Gordon Hill. Yeah. A lot of times we have rather unusual names in these cases, and one that would be more readily recognized by a police officer. Yeah, that is true, but the testimony of Kidwell, and he didn't testify that he recognized his face or anything like that, but he did make it sound as if right when he heard that name, in his mind there was a history of firearms and weapons, and that's what he is basing his decision to make the search on, on what he feels for his safety at that time, and what he was reasonably inferring at that time, and the facts in his mind at that time were that this guy had a history of a firearm, so I think that... But when he heard his name, had the defendant already reached into his pocket and pulled out the bottle of, I think it was gin? They asked, if I recall correctly, they asked the defendant for his name, he said Gordon Hill, then they asked him if they could search him, he said is that necessary, and then he pulls out the bottle of gin. Right. They hear the name, the officer recognizes the name as someone who he believes has had weapons charges, and yet they allow the defendant to reach into his pocket, and thank goodness he doesn't pull out a weapon, but pulls out a bottle of gin. Right. How does that reflect on the credibility of the officer really believing that safety, that this pat down was necessary for safety? I'm getting at, if they're really worried, why do they let him reach into his pocket? Right. According to Kidwell's testimony, he asked the defendant for his name, he said Gordon Hill, asked him if he could search him, he said is that necessary, then he pulls out the gin bottle, and then according to Kidwell's testimony, it was only then that he recognized that name as someone who was dealing, who had a history of weapons and drug offenses. So my recollection and my understanding of Kidwell's testimony was that it was only after the guy pulled out the gin that he kind of, the engine was turning, and then that name kind of rung a bell. Let's correct something. It's not what the officer himself believed, is it? Is that the actual standard that we apply here? It's what a reasonable person in the officer's circumstances would infer. Right. Also worth noting that, and I think Justice McCullough I think mentioned this, that the officers both testified that in Danville there had been three separate murders within one or two years. All of those murders were drug related and involved a firearm, and besides those murders, Danville, the officers all testified that there were numerous other shootings. In this area? Involving drug dealings. In the Danville. I mean, they actually did, and I apologize if I, in my brief, if I conveyed that it was in this immediate area. I think what I was trying to infer was that it was in Danville, and these officers were testifying, and it seemed like it was in their jurisdiction, and so I didn't mean to infer that it was on Fairway Street. So the testimony isn't clear if it's in that exact area, but the officers did testify that these shootings and murders occurred in Danville. Kidwell and Campbell also both testified that drug dealers usually carry firearms, and that drugs and firearms go hand in hand. I think the Austin case is specifically on point. Defense mentions two factual distinguishing factors, and I think with these sort of factual cases, you're never going to find a case that's directly on point. There's always going to be some factual distinguishments to be made. But in Austin, the officer had the defendant actually have his hands on a car. His hands were on the car, and the defendant wasn't making any sharp movements or anything that made it seem like he was going to do anything dramatic or right away. And the court in Austin specifically found that the officer recognized the defendant's name in that case. The officer testified that drug dealers often carry firearms. And they actually did mention his size. That is one of the things they mentioned. One of the things that I mentioned in this case that I think was significant that might not have made a whole lot of sense is the defendant was actually in the middle of the street. I believe that that provides a situation that could be more dangerous for the officers. He's more of a flight risk, I think, in that situation. It's 1030 at night. Well, it's actually a violation to walk down the middle of the street, isn't it? Yeah, it is. Let me ask you this. Once the officers determine their safety is in danger and decide they want to search, that pat-down search is only for weapons, correct? Correct. And this officer didn't feel a weapon, correct? Correct. So what's the justification if a weapon was not found for removing the cannabis or controlled substance? I believe it's cannabis, Your Honor. Excuse me? I believe it's cannabis. Okay. How can they do that? They're looking for a weapon. They don't find a weapon. Kidwell actually testified to this, and I think this answers your question, that Kidwell, through his expertise, recognized it was drugs. So even during the pat-down, while he was feeling it… He knew it was cannabis? He testified that he knew it was cannabis. He did. How was it packaged? It was in 20 small baggies. So, I mean, there's a lot of… That feels… I would think I've never patted someone down with 20 baggies of cannabis, but that's… I'm trying to think. Okay. So he's patting down for a weapon. He feels something. He knows it isn't a weapon, but because of his experience in law enforcement… And specifically drugs. …he has probable cause to believe it is… Cannabis. In this case, cannabis. Ergo, once probable cause is established, then he can… Yes, Your Honor. …complete the search by removing the cannabis himself. Yes, Your Honor. Okay. And I think it's definitely reasonable to believe this testimony, that if you feel something… I mean, 20 small baggies, that's going to feel pretty strange, and I think he was obviously justified in… Paul, I don't think that was an issue actually raised by the defendant. No, it was not. No, it was not. I just wanted you to satisfy my curiosity on that. Okay. Did I do that, Your Honor? You did great. Okay. All right. So basically, I mean, the two issues before this court are, one, did the officers have a reasonable, articulable suspicion to perform the Terry stop? I believe they did, based on the totality of the circumstances. Individually, maybe not, but there's a big pile of evidence that suggests that drug activity was going on and that these officers made… they cited reasonable, articulable facts in their testimony that would lead a reasonable officer to infer that a crime had just been committed specifically by this defendant. Second issue is whether the officers reasonably feared for their safety. I believe that based on the drug dealings that recently took place, that they believe that this defendant actually was dealing the drugs. I believe that the inference that this defendant had prior weapons offenses, a dark night in the middle of the street, all would have led a reasonably prudent person under these circumstances to believe that their safety was in danger. And if you have no further questions, time is up. Thank you. Yes, Your Honor. What did the officer say to the defendant when he asked to search him? What did the officer ask the defendant? I believe he asked if… I don't know specifically. If you'll give me a second, I can check my brief. Was it a request for consent to search? I want to get specifically what he asked. I believe they asked him if they could search him. Can we search you? Thank you. Thank you, Your Honors. Good follow-up, please. Thank you, Your Honor. Very briefly, I just want to touch on some points that were raised by the State. Specifically, they do ask if he will consent to a search because his exact answer to that is then, is it necessary? So I believe it's Officer Campbell who says, will you consent to a search? The answer to that is, is it necessary? And that's when Officer Kidwell, that's when I recall that he had weapons offenses and they jumped to the pat-down after that. So there's really no timeline in there. I mean, if they ask him for consent, he says, is it necessary? And then they jump right to the pat-down because of what Officer Kidwell believes is in his background. Well, the reason I ask the question is I'm reading a case, People v. Castiglio, which is actually a 2nd District case issued September 11, 2009, written by O'Malley. And I'm quoting, he's quoting from Le Fay. Similarly, a request for consent to search does not convert a consensual encounter into a seizure as long as the police do not convey a message that compliance with their request is required. And then they cite two federal cases, U.S. Supreme Court cases, and it says the Supreme Court has held repeatedly that police may approach persons and ask questions or seek their permission to search provided that the officers do not imply that answers or consent are obligatory. Well, in this case, I would say the difference here is that once they say, you know, they ask for consent, he says, is it necessary? There's no break in that. What happens next is they get, one's on the right side, one's on the left side, and they start patting him down. So at this point, he wouldn't be free to leave. I mean, they're restricting him. And as soon as Officer Kimball puts his hand on what he believes to be cannabis, is what he testifies to, they handcuff Mr. Hill. I just wanted to kind of go back, if there is nothing further on that. Terry specifically says, where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or other safety, he's entitled for his protection to pat down. The argument that the defense is making is similar to what Justice Turner was talking about. The fact that we do have Mr. Hill when asked, he is asked specifically, do you have anything on your person we should be concerned about? And he voluntarily pulls out this gin bottle that's unopened. Both officers testify that Mr. Hill did not appear inebriated in any way. And they also testify that he's very cooperative. Both officers describe him as cooperative. They're not worried about him fleeing at this point. So I think there are any, if it were reasonable, which I don't think it is an inference, at this point it was dispelled. And so again, the defendant just asked for this court to reverse the decision of the trial court, denying Mr. Hill's motion to suppress the evidence. Thank you very much. Thank you, counsel. The court will take the matter under its rights.